FILED
SUPERIOR COURT
OF GUAM

2022 OCT 11 AM 10:47

CLERK OF COURT

BY:_____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| THE PEOPLE OF GUAM | Case No. CF0711-19 |
| vs. | **DECISION AND ORDER**<br>(Motion to Suppress) |
| ZERXES JABIDANDO VIVA | |
| Defendant. | |

## INTRODUCTION

This matter came before the Honorable Alberto E. Tolentino on July 19, 2022, for an Evidentiary Hearing on Zerxes Jabidando Viva's ("Defendant") Motion to Suppress and Request for Evidentiary Hearing ("Motion to Suppress"). Assistant Public Defender Gloria Rudolph appeared for Defendant. Assistant Attorney General Katherine Nepton appeared for the People of Guam ("People"). Having considered the testimony of the witnesses, arguments, and applicable law, the Court hereby **GRANTS** Defendant's Motion to Suppress.

## BACKGROUND

On January 3, 2022, the Grand Jury indicted Defendant on the following charges: (1) Possession of a Schedule II Controlled Substance with Intent to Deliver (As a First Degree Felony) and (2) Possession of a Schedule II Controlled Substance (As a Third Degree Felony). Indictment, Jan. 2, 2020. Defendant filed the instant motion. Mot. to Suppress, May 24, 2022.

**ORIGINAL**

The People filed an opposition. People's Opp'n. to Def.'s Mot. to Suppress, June 3, 2022. Defendant filed a reply to the People's opposition. Reply to People's Opp'n. to Def.'s Mot. to Suppress, June 14, 2022. On July 19, 2022, the Court held an evidentiary hearing. Minute Entry, July 19, 2022. The parties submitted proposed findings of fact and conclusions of law. [Proposed] Findings of Fact and Conclusions of Law Re: Mot. to Suppress, Aug. 1, 2022; People's Proposed Findings of Fact and Conclusions of Law Re: Evidentiary Hearing, Aug. 2, 2022. The Court took the matter under advisement.

## FINDING OF FACT

Guam Police Department ("GPD") Sergeant Ephraim Amaguin, GPD Officer Christopher Champion, and GPD Officer Johnathan Conner were the witnesses called by Defendant during the evidentiary hearing. Digital Recording at 3:01:32–4:54:01 (Mot. H'rg. July 19, 2022). GPD Sergeant Ephraim Amaguin, GPD Officer Christopher Champion, GPD Officer Johnathan Conner, and Parole Officer Lisa Monique Castro Tainatongo were the witnesses called by the People. *Id.* From the testimony of the witnesses and the parties' proposed finding of facts the Court finds:

On December 28, 2019, Sergeant Amaguin parked his patrol vehicle at a private residence while on patrol in the early morning hours. Digital Recording at 3:01:32–3:43:45 (Mot. H'rg. July 19, 2022). The private residence is located at the intersection of North Luisa Street and Sunset Lane in Tumon Heights. *Id.* Sergeant Amaguin's patrol car is a Mitsubishi Outlander with yellow Government of Guam license plates on the front of the vehicle and GPD markings on the sides of the vehicle. *Id.* The vehicle was not running. *Id.* While sitting in his

ORIGINAL


patrol car, Sergeant Amaguin observed Defendant's vehicle failed to stop at the stop sign in the intersection at approximately 1:30a.m. and Sergeant Amaguin initiated a traffic stop. *Id.*

Defendant pulled over onto the grass near his mother's house upon Sergeant Amaguin initiating the traffic stop. *Id.* Sergeant Amaguin stated that he approached Defendant and they had a brief conversation. *Id.* Sergeant Amaguin testified that he asked Defendant if he had any drugs, obtained consent to search the vehicle, and then "called for back-up." *Id.* Sergeant Amaguin further testified that Defendant exited the vehicle without Sergeant Amaguin requesting him to do so, which is "generally a cause for concern for [Sergeant Amaguin]." *Id.* It also often indicates that the individual possesses something in the vehicle that he does not want GPD to see. *Id.*

Sergeant Amaguin testified that he knew Defendant from previous encounters, and consequently did not ask for Defendant's license, registration, or insurance card. *Id.* He also testified that he did not check to see who the car was registered to, but that Defendant informed him that it was a rental car when he gave Sergeant Amaguin permission to search the vehicle. *Id.* Sergeant Amaguin stated that he did not run the license plates to see if the car was stolen, and he did not check to see if Defendant had any outstanding warrants. *Id.* Sergeant Amaguin further testified that he had no reason to believe that Defendant was impaired and did not offer Defendant a field sobriety test. *Id.*

Officer Champion arrived on the scene approximately three or five minutes after Sergeant Amaguin called for back-up. Digital Recording at 3:45:27–4:10:07 (Mot. H'rg. July 19, 2022). Upon his arrival, he observed Defendant and Sergeant Amaguin conversing outside of Defendant's vehicle. *Id.* Officer Champion testified that his report states that he observed a

ORIGINAL

message banner on Defendant's phone, and no pictures or data were collected from the banner. *Id.* The banner said something about drugs. *Id.* Officer Champion was tasked with searching the vehicle. *Id.* He testified that he observed a kitchen knife almost immediately upon walking over to the vehicle. *Id.* He stated that it "appeared to be placed in a manner that it would be easily accessible for defense." *Id.* During his search of the vehicle, Officer Champion also found a black pouch under the passenger's seat, which contained a plastic bag of a white crystalline substance and a heat-sealed straw. *Id.* Officer Champion recovered $1,000 in cash from either the vehicle or Defendant's wallet. *Id.* Officer Champion testified that he did not "recall there being a wallet" and the he believes that he obtained the wallet during a pat down. *Id.* He further testified that he "would assume [the wallet] would be on [Defendant's] person, however, it's not uncommon that it would be within the vehicle." *Id.* Officer Champion believes someone verified that the vehicle was a rental car, but said that his report states that he did not. *Id.*

Officer Conner arrived at the scene with Officer Champion, as a trainee. Digital Recording at 4:11:32–4:22:37 (Mot. H'rg. July 19, 2022). Officer Conner testified that the extent of his contact with Defendant was putting him in handcuffs. *Id.* He further testified that his report did not contain anything about a kitchen knife found in the vehicle, about a message banner on Defendant's phone, about verification of the vehicle registration, or about consent to search the vehicle. *Id.* He did not indicate in his custody reports that a kitchen knife was confiscated. *Id.* Officer Conner stated he did not read Defendant his *Miranda* rights and he does not remember anyone reading Defendant his *Miranda* rights. *Id.* He did observe a black pouch containing a crystalline substance. *Id.* The wallet was found on Defendant's person and



contained $1,700 in cash. *Id.* Officer Conner spoke to Officer Champion to verify Defendant's identity and to look at Defendant's driver's license. Digital Recording at 4:37:13–4:39:33 (Mot. H'rg. July 19, 2022).

None of the officers issued a traffic ticket for failure to stop at the stop sign, offered Defendant a field sobriety test, verified the vehicle's registration and insurance, checked to see if Defendant had any outstanding warrants, or ran the license plates to determine whether the vehicle was stolen. Digital Recording at 3:01:32–4:54:01 (Mot. H'rg. July 19, 2022).

Parole Officer Tainatongo testified that she was Defendant's parole officer at the time of the incident. Digital Recording at 3:01:32–4:54:01 (Mot. H'rg. July 19, 2022). She stated that Defendant was on parole at the time of the incident. Digital Recording at 4:40:11–4:52:38 (Mot. H'rg. July 19, 2022). Under Defendant's parole conditions, he cannot deny parole officers' requests to search his vehicle for contraband. *Id.*

**DISCUSSION**

Defendant argues that the contraband GPD seized should be suppressed because there was no consent to search the vehicle. Mot. to Suppress at 3–6. Defendant further argues that his arrest was illegal because the officers did not have probable cause to make an arrest. *Id.* The People assert that GPD obtained consent to search the vehicle. People's Opp'n. to Def.'s Mot. to Suppress at 3–4. The People further assert that if the consent was insufficient, Defendant was obligated under his parole conditions to permit the officers to search the vehicle. *Id.*

The Fourth Amendment protects against unreasonable searches and seizures and is made applicable to Guam via section 1421b(c) of the Organic Act of Guam. *People v. Johnson*, 1997

Guam 9 ¶ 4. "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). Every search or seizure must be reasonable under the circumstances to pass muster under the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 810 (1996).

**A. The initial stop of the vehicle was a valid *Terry* stop under the Fourth Amendment but turned into an unlawful seizure after the purpose of the traffic stop was completed.**

The Fourth Amendment to the United States Constitution "permits brief investigative detentions when a police officer has a reasonable suspicion that an individual was engaged in or is about to be engaged in illegal conduct." *Johnson*, 1997 Guam 9 ¶ 4 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). "The *Terry* stop doctrine has been extended to justify the investigatory stop of a motor vehicle." *Johnson*, 1997 Guam 9 ¶ 4 (citing *United States v. Sharpe*, 470 U.S. 675, 682 (1985)). "As a general matter, the decision to stop an automobile [without a warrant] is reasonable where the police have probable cause to believe that a traffic violation has occurred. Further, it is reasonable to stop a car where the police merely have reasonable suspicion to believe the driver has committed a traffic violation." *People v. Charagulaf*, 2001 Guam 1 ¶ 17 (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). "In order to determine whether an officer had reasonable suspicion sufficient to warrant a traffic stop, the court must look at the totality of the circumstances, taking into account the facts known to the officers from personal observation." *Johnson*, 1997 Guam 9 ¶ 4. Furthermore, reasonable suspicion must exist at the time the stop was initiated. *Id.*

ORIGINAL

Guam law requires motorists come to a full stop before entering an intersection when an official stop sign has been erected. 16 G.C.A. § 3334(b). Sergeant Amaguin testified that he observed Defendant fail to stop at a stop sign. Digital Recording at 3:01:32–3:43:45 (Mot. H'rg. July 19, 2022). Defendant contends that he did not fail to stop at the stop sign; he was aware of the GPD vehicle parked at a residence near the intersection and made sure not to commit a traffic violation because of his parole status. [Proposed] Findings of Fact and Conclusions of Law Re: Mot. to Suppress at 4. However, it was dark outside and Sergeant Amaguin's vehicle was turned off. Digital Recording at 3:01:32–3:43:45 (Mot. H'rg. July 19, 2022). Exhibit F and Exhibit L do show some lighting to the area where Sergeant Amaguin was parked, and Sergeant Amaguin's vehicle is a Mitsubishi Outlander that has Government of Guam license plates and GPD markings on the sides. Digital Recording at 3:01:32–3:43:45 (Mot. H'rg. July 19, 2022). Even so, the darkness, the make and model of Sergeant Amaguin's vehicle, and the position of Sergeant Amaguin's vehicle in the driveway would have made it difficult for Defendant to discern that the vehicle belonged to law enforcement. The Court finds that because there was minimal lighting and Sergeant Amaguin's vehicle is not a typical patrol car, it is likely that Defendant did not realize Sergeant Amaguin was a law enforcement officer and Defendant failed to stop at the stop sign. The Court finds nothing in the record suggesting that Sergeant Amaguin is mistaken about Defendant running the stop sign. Sergeant Amaguin is a seasoned law enforcement officer who was watching the road for traffic violations that night. Therefore, because Sergeant Amaguin observed a traffic violation—failure to stop at a stop sign—he had reasonable suspicion to pull over the vehicle for a valid *Terry* stop. As the


ORIGINAL

driver of the vehicle, Defendant was lawfully seized upon Sergeant Amaguin initiating the traffic stop.

**B. The search of Defendant's vehicle was outside of the scope of the traffic stop and, therefore, constituted an unreasonable search.**

"Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attended to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "The scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than necessary to effectuate that purpose.'" *Rodriguez*, 575 U.S. at 354 (quoting *Florida v. Royer*, 460 U.S. 491, 500). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. at 354 (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

All three officers testified that Defendant was never issued a ticket for the traffic violation. Digital Recording at 3:01:32–4:54:01 (Mot. H'rg. July 19, 2022). Accordingly, the *Terry* stop ended when the purpose of the traffic stop—issuing a citation for running a stop sign—should have been completed. Sergeant Amaguin states that Defendant exited the vehicle before Sergeant Amaguin instructed him to do so, which was "cause for concern." Digital Recording at 3:01:32–3:43:45 (Mot. H'rg. July 19, 2022). Officers are permitted to make minimal intrusions into a driver's liberty during a traffic stop to protect their safety. *See Mimms*, 434 U.S. at 111–10 ("We think it is too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty."). Consequently, Sergeant Amaguin would have been permitted to pat down Defendant to ensure he did not have

ORIGINAL

any weapons on his person after Defendant stepped out of the vehicle unsolicited. Nothing in the record suggests that Sergeant Amaguin conducted a pat down after Defendant exited the vehicle. As Defendant was already outside of the vehicle, there was no risk of Defendant gaining immediate control of a weapon within reach. Instead, Sergeant Amaguin testified the he asked Defendant if he had any illegal drugs. Digital Recording at 3:01:32–3:43:45 (Mot. H'rg. July 19, 2022). Sergeant Amaguin testified that he had previous encounters with Defendant where he was arrested for possessing illegal controlled substances. *Id.* Besides Sergeant Amaguin's knowledge that Defendant was previously arrested for possession of illegal controlled substances, nothing in the record indicates that Sergeant Amaguin had any reason to believe Defendant possessed illegal drugs that night. Furthermore, the existence of illegal drugs in the vehicle did not pose a threat to Sergeant Amaguin's safety. As a result, Sergeant Amaguin was not permitted to ask Defendant if he possessed any illegal drugs when the purpose of the traffic stop was Defendant's failure to stop at a stop sign.

"Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries into the traffic stop." *Rodriguez*, 575 U.S. at 355 (citing *Illinois v. Caballes*, 543 U.S. 405 (2005)). "Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. The purpose of these inquiries and a limited search is to ensure officer safety and the safety of drivers on the road. *See Adams v. Williams*, 407 U.S. 143, 146 (1972) ("The purpose of this limited search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable,



whether or not carrying a concealed weapon violated any state law."); *see also* 4 Wayne R. LaFave, *Search and Seizure* § 9.3(c), (6th ed. 2021) (stating a warrant check makes it possible to determine whether the person in front of the officer is wanted for previous traffic offenses).

Nothing in the record demonstrates that the officers performed any of the ordinary inquires during the traffic stop. Sergeant Amaguin testified that because he knew Defendant, he did not request Defendant's license, registration, or insurance card. Digital Recording at 3:01:32–3:43:45 (Mot. H'rg. July 19, 2022). Sergeant Amaguin testified he did not check to see if Defendant had any outstanding warrants, and he did not run license plates on the vehicle to see if it was stolen. *Id.* Officer Champion testified that he believed someone verified that the vehicle was a rental vehicle, but he did not do so. Digital Recording at 3:45:27–4:10:07 (Mot. H'rg. July 19, 2022). No other officer testified to verifying that the vehicle was a rental vehicle. Officer Conner stated he obtained Defendant's driver's license from Officer Champion after the search of the vehicle. Digital Recording at 4:11:32–4:22:37 (Mot. H'rg. July 19, 2022). Officer Conner also testified that he did not know the reason for the traffic stop. *Id.* Accordingly, the Court finds the officers failed to perform any ordinary inquiries into the traffic stop and to issue a citation for a traffic violation. The only inquiry the officers state performing is a check of Defendant's driver's license, which they did after the search of the vehicle. Consequently, it appears that upon recognizing Defendant, Sergeant Amaguin's purpose for the traffic stop was to search Defendant's vehicle for illegal drugs.

Both Officer Champion and Officer Conner mentioned a pat down of Defendant during their testimony. Digital Recording at 3:45:27–4:10:07 (Mot. H'rg. July 19, 2022). A pat down of Defendant's person to check for weapons would have been valid, especially because he

exited the vehicle without being told to do so. However, Officer Conner's testimony denotes that the purpose of the pat down was to look for illegal drugs, as illustrated by the fact that $1,700 in cash was discovered in Defendant's wallet. A *Terry* stop permits a frisk to check for weapons. *Terry v. Ohio*, 392 U.S. 1, 30–31 (1968). A pat down during a *Terry* stop does not permit the officers to confiscate Defendant's wallet and search the contents, unless the wallet resembled a weapon during the frisk. *Cf. id.* at 26 ("[A search for weapons] must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a 'full' search, even though it remains a serious intrusion."). The officers did not state in their testimony that they mistook the wallet for a weapon.

Officer Champion states that he observed a kitchen knife in the vehicle that "appeared to be placed in a manner that it would be easily accessible for defense." Digital Recording at 3:45:27–4:10:07 (Mot. H'rg. July 19, 2022). This kitchen knife was never recorded in the custody papers and Officer Conner testified that his report contains no mention of the kitchen knife. Digital Recording at 4:11:32–4:22:37 (Mot. H'rg. July 19, 2022). Sergeant Amaguin did not make any statement about a kitchen knife during his testimony. As a result, it is not clear to the Court that Defendant's vehicle contained a kitchen knife. Assuming it did, the presence of a visible weapon would have permitted the officers to search Defendant's vehicle. *See Terry*, 392 U.S. at 24. Yet, Officer's Champion's testimony indicates that he did not find he knife until after he began searching the vehicle. Digital Recording at 3:45:27–4:10:07 (Mot. H'rg. July 19, 2022). The discovery of the alleged knife, therefore, occurred during the unlawful search and is not grounds to justify the search.

ORIGINAL

Officer Champion testified that his report states that he observed a message banner on Defendant's phone that discussed drugs. *Id.* Officer Conner testified that his report contains no mention of this message banner. Digital Recording at 4:11:32–4:22:37 (Mot. H'rg. July 19, 2022). Sergeant Amaguin did not make any statement about the message banner during his testimony. The Magistrate Complaint states that a message banner discussing methamphetamine was observed on Defendant's phone after he was transported to the precinct. Mag. Compl., Dec. 28, 2019. Like the existence of the knife, it is not clear to the Court that Defendant's cell phone contained a message banner discussing illegal drugs, and if it did, that the officers viewed the banner prior to the search of Defendant's vehicle. Assuming the officers did, communications about illegal drugs would likely not support probable cause to search the vehicle. *Cf. Horton v. California*, 496 U.S. 128, 136 (stating that not only must incriminating evidence be in plain view, but that its "incriminating character must be immediately apparent."). Officer Champion found a black pouch under the passenger's seat, which contained a plastic bag of a white crystalline substance and a heat-sealed straw. As the crystalline substance and heat-sealed straw were inside of the black pouch, their incriminating character was not immediately apparent.

In *Illinois v. Caballes*, 543 U.S. 405 (2005) the Supreme Court of the United States found that officers were permitted to prolong a traffic stop to use a narcotics detection dog to look for contraband even though the defendant was initially pulled over for speeding. *Caballes*, 543 U.S. at 408–10. The Supreme Court of the United States reasoned that the use of a narcotics detection dog does not compromise any legitimate interest in privacy because there is no legitimate interest to privacy in possessing contraband. *Id.* An exterior search of a vehicle

with a narcotics detection dog reveals only unlawful activity and not any lawful activity. *Id.* The Court finds this case is distinct from *Caballes*. Unlike the use of a dog trained to uncover only narcotics, a search of the inside of Defendant's vehicle by officers could reveal both lawful and unlawful activity. Officers conducting a search inside of Defendant's vehicle could have found noncontraband items that were otherwise concealed from public view. Thus, the Court finds the officers were not permitted to prolong the stop by searching Defendant's vehicle. The Court holds that the search of the vehicle exceeded the scope of the traffic stop and constitutes an unlawful search. Specifically, the officers' failure to perform any ordinary inquiries and Sergeant Amaguin's question to Defendant regarding illegal drugs in the vehicle demonstrates that the mission of the *Terry* stop was not to address the traffic violation and related safety concerns, but to search Defendant's vehicle for illegal drugs.

**C. The length of the detention violated Guam's "Stop and Frisk" Act.**

Title 8 G.C.A. §§ 30.10–30.60 constitutes Guam's "Stop and Frisk" Act. Under the "Stop and Frisk" Act, a peace officer may detain any person "under circumstances which reasonably indicate that such a person has committed, is committing, or is about to commit a criminal offense." 8 G.C.A. § 30.10. The purpose of the detention is to ascertain "the identity of the person detained and the circumstances surrounding his presence abroad which lead [sic] the officer to believe that he had committed, was committing, or was about to commit a criminal offense, but such person shall not be compelled to answer any inquiry of the peace officer." 8 G.C.A. § 30.20. However, the detention shall not last longer than fifteen minutes. 8 G.C.A. § 30.20. A peace officer may search a person to the extent necessary to disclose the presence of a weapon if the peace officer "reasonably believes that a person whom he has detained, or is

ORIGINAL

about to detain, is armed with a dangerous weapon and therefore offers a threat to the safety of the officer or another." 8 G.C.A. § 30.50. "If after an inquiry into the circumstances which prompted the detention, no probable cause for the arrest shall appear, he shall be released." 8 G.C.A. § 30.40.

Sergeant Amaguin stopped Defendant upon watching Defendant's vehicle fail to stop at a stop sign, which was a valid traffic stop. Sergeant Amaguin testified that he stopped Defendant at approximately 1:30am. Digital Recording at 3:01:32–3:43:45 (Mot. H'rg. July 19, 2022). The record is not clear on the length of Defendant's detention before the search of his vehicle. Sergeant Amaguin testified that upon Defendant exiting his vehicle, Sergeant Amaguin approached him and they had a brief conversation. *Id.* Sergeant Amaguin testified that following the conversation, he asked if Defendant had any drugs, requested consent to search Defendant's vehicle, and called for back-up. *Id.* Officer Champion testified that he arrived between three and five minutes after Sergeant Amaguin called for back-up. Digital Recording at 3:45:27–4:10:07 (Mot. H'rg. July 19, 2022). Officer Champion testified that he was tasked with searching Defendant's vehicle. *Id.* It is unclear how much time passed between Officer Champion's arrival and his search of Defendant's vehicle. Regardless, the Court estimates the length of time between the initiation of the traffic stop and Officer Champion's search of Defendant's vehicle exceeded fifteen minutes.

Moreover, 8 G.C.A. § 30.20 states that the purpose of the detention is for the officer to ascertain the detained person's identity and the circumstances that led to the traffic stop. Yet, during the first fifteen minutes the officers did not perform a check for outstanding warrants or run Defendant's license plate, nor did they verify Defendant's driver's license, registration, or

ORIGINAL

insurance card. Digital Recording at 3:01:32–4:54:01 (Mot. H'rg. July 19, 2022). The officers did not issue Defendant a ticket for failing to stop his vehicle at the stop sign. *Id.* Accordingly, the officers did not adhere to the purpose of the traffic stop; rather, the purpose of the traffic stop was to search Defendant's vehicle for drugs. The officers would have been permitted to search Defendant if they reasonably believed that he was armed with a dangerous weapon. *See* 8 G.C.A. § 30.50. Nonetheless, the record suggests that the officers did not perform a pat down of Defendant until after they arrested him. The kitchen knife's existence is dubious, and even if it was present in Defendant's vehicle, it is not sufficient to establish probable cause. Likewise, the message banner's existence is dubious, and it is not sufficient to establish probable cause. As a result, the officers did not have a justification for extending the detention beyond fifteen minutes, especially because they did not perform any actions consistent with the purpose of the traffic stop. The Court holds the detention violation Guam's Stop and Frisk Act.

**D. The officers did not know Defendant was on parole and, therefore, Defendant's status as a parolee did not make the search reasonable.**

The People argue that that "Defendant was under an obligation to comply with Peace Officers to allow a search of his person and automobile." People's Opp'n. to Def.'s Mot. to Suppress at 3. Parole Officer Tainatono testified that Defendant's Statements and Conditions Upon Granted Parole or Full-Term Release require Defendant to permit "parole officers"—not "peace officers" to conduct searches. Digital Recording at 3:01:32–4:54:01 (Mot. H'rg. July 19, 2022). Yet, it is not clear to the Court that the officers knew that Defendant was on parole.

The Supreme Court of Guam has not explicitly stated whether police officers must know that the defendant is on parole before conducting a search of the defendant's automobile subject to his parole conditions. The Supreme Court of the United States found that under California's



precedent "an officer would not act reasonably in conducting a suspicionless search absent knowledge that the person stopped for the search is a parolee." *Samson v. California*, 547 U.S. 843, 856 n. 5 (2006). Similarly, federal courts have found searches unreasonable where police officers did not know that the defendant was on parole prior to conducting the search. *See e.g., United States v. Caseres*, 533 F.3d 1064, 1075–76 (9th Cir. 2008) ("The search condition validates a search only if the police have advance knowledge that the search condition applied before they conducted the search."); *see also e.g., Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005) ("[A] officer must know of a detainee's parole status before that person can be detained and searched pursuant to a parole condition."); *and Fitzgerald v. City of Los Angeles*, 485 F.Supp. 2d 1137, 1143 (9th Cir. 2007) (stating that an officer must have knowledge of an individual's parole status before the suspicionless search beings; if the officer learns of the suspicionless search after the search begins, it is a violation of the Fourth Amendment).

Sergeant Amaguin testified that he recognized Defendant from previous encounters where he was arrested for possession of illegal drugs. Knowledge of Defendant's previous arrests does not equate to knowledge that Defendant was on parole at the time of the traffic stop. None of the officers testified that they asked Defendant if he was on parole or probation during the traffic stop. Sergeant Amaguin's Supplement Narrative to the police report states that he asked Defendant if "he was still on probation" and "[Defendant] stated yes." Sergeant Amaguin's Supplemental Narrative further states "[Sergeant Amaguin] asked if [Defendant] had any drugs on him. [Defendant] stated no and that he is clean." However, upon reviewing the officers' testimony, it is not clear to the Court that Sergeant Amaguin asked if Defendant was on probation prior to searching the vehicle for illegal drugs. The multitude of

ORIGINAL

inconsistencies in the officers' testimony and the testimony that the officers did not perform the ordinary inquiries during the traffic stop alludes that Sergeant Amaguin did not ask Defendant if he was on probation or obtain consent to search the vehicle. Moreover, it is clear that the officers did not verify Defendant's statement that he was on probation because if they had done so, they would have learned that he was not on probation but on parole. Nowhere in the record do the officers state they knew that Defendant was on parole. There are inconsistencies in the officer's testimony regarding if and when they obtained consent to search the vehicle. Thus, the Court finds that the officers believed Defendant was on probation because they previously arrested him but did not actually know that Defendant was on parole.

Furthermore, Defendant's parole conditions require that he consent to a search by "parole officers." Digital Recording at 3:01:32–4:54:01 (Mot. H'rg. July 19, 2022). As an aside, Sergeant Amaguin, Officer Champion, and Officer Conner are not parole officers so it is unclear that Defendant's conditions required him to consent to their request to search. Even so, assuming Defendant's conditions required him to consent to a search by the any law enforcement officer, Defendant still maintains the option to decline a law enforcement's request to search his vehicle. If Defendant declines a search by law enforcement officers, it results in a parole violation. Parole violations are handled by his Parole Officer, Parole Officer Lisa Monique Castro Tainatongo. Consequently, if Defendant declined the Sergeant Amaguin's request to search his vehicle, the Sergeant Amaguin was required to honor his refusal and inform Parole Officer Lisa Monique Castro Tainatongo; he was not permitted to search the vehicle anyways.

ORIGINAL

**E. Under the exclusionary rule and the fruit of the poisonous tree doctrine, the items found in the vehicle are products of an unreasonable search and are inadmissible.**

Defendant moves the Court to suppress the evidence seized under the fruit of the poisonous tree doctrine. Mot. to Suppress at 5–6. "Before evidence may be suppressed under [the fruit of the poisonous tree] doctrine, the court must initially resolve whether the challenged evidence was come at by the initial illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *People v. Cundiff*, 2006 Guam 12 ¶ 41 (quoting *Segura v. United States*, 468 U.S. 796, 804–05 (1984). Thus, the Court looks to see whether any independent evidence was presented that would "break the casual chain" between the illegal search of Defendant's vehicle and the seizure of items from Defendant's vehicle and Defendant's person. *See Oregon v. Elstad*, 470 U.S. 298, 306 (1985).

The illegal drugs and drug paraphernalia found in Defendant's vehicle were discovered during Officer's Champion's search of the vehicle, which was an unlawful search. Any items found on Defendant's person were found as the result of an arrest stemming from the unlawful search; Defendant would not have been arrested absent the discovery of the illegal drugs and drug paraphernalia in the vehicle. There is nothing in the record that indicates there was any intervening event or independent discovery to break the casual connection between the illegal search and the discovery of the illegal drugs and drug paraphernalia. Accordingly, the Court finds the items obtained from Defendant's vehicle and Defendant's person must be suppressed.

ORIGINAL

## CONCLUSION AND ORDER

For the above reasons, the Court **GRANTS** Defendant's Motion to Suppress and

**ORDERS** the items obtained from Defendant's vehicle and Defendant's person inadmissible.

Further Proceedings 12/06/2022 at 11am

SO ORDERED, this ___11___ day of ___October___ 2022.



HONORABLE ALBERTO E. TOLENTINO
Judge, Superior Court of Guam

ORIGINAL